UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-11607 |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY | ) | Honorable Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNION PACIFIC RAILROAD COMPANY'S STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant, UNION PACIFIC RAILROAD COMPANY ("Union Pacific"), by its undersigned counsel, and submits this Statement of Facts in Support of its Motion for Summary Judgment pursuant to Local Rule 56.1(a)(3):

**Parties, Jurisdiction and Venue**

1. Defendant UNION PACIFIC RAILROAD COMPANY ("Union Pacific") is a common carrier by rail in interstate commerce. (Plaintiff's Complaint at ¶ 6.)

2. Plaintiff AARON HARRIS is an employee within the Commuter Operations service unit of Union Pacific in Chicago, Illinois. (Exhibit A, Plaintiff's HR Report.)

3. On December 23, 2016, Plaintiff filed his Complaint against Union Pacific claiming perceived disability discrimination, race discrimination, and retaliation. (Compl. at ¶ 1.)

4. Union Pacific answered Plaintiff's Amended Complaint denying all material allegations. (*See Generally* Union Pacific's Answer to Plaintiff's Complaint.)

**Relevant Facts**

5. Plaintiff (African-American) hired on with Union Pacific in 1999. (Exhibit B Plaintiff Deposition at p. 10:7-9.) Plaintiff held various positions at Union Pacific until he was

1

promoted to a Tower Operator in 2004 and remained in that position because it was "a better job." (Ex. B at p. 11:14-19, 12:11-14.) A Tower Operator is responsible for the same movement of trains within a train yard. The Tower Operator directs engineers, conductor and hostlers in moving trains from point A to point B; controls signals, and ensures the safety of employees working on the tracks by putting trains on opposite tracks. (Ex. B at p. 11:23-24, 12:1-6.)

6. There are three departments at the railroad, Engineering, Transportation, and Mechanical. Plaintiff was a member of the Transportation Department.

7. Plaintiff worked on the Extra Board during his training for the Tower Operator position which meant that he did not have a set schedule or worksite. (Ex. B at p. 17:9-13, 18:12-15.) He was required to work five days a week, at whatever tower he was told to go to, and for whichever shift. (Ex. B at p. 18:6-8.)

8. In 2005, Plaintiff transitioned to an Emergency Board position and remained in that position consistently until the present. (Ex. B at p. 17:22-24, 25:7-11.) An Emergency Board Tower Operator fills temporary vacancies in Tower Operator positions. (Ex. B at p. 33:9-12.) Plaintiff is responsible for filling in for someone who calls in sick, has an emergency, or is on vacation. (Ex. B at p. 33:13-17.) It is also Plaintiff's responsibility to assist at towers when required and/or when additional Tower Operators are needed temporarily. (Ex. B at p. 34:21-24, 35:1.)

9. Plaintiff is still on the Emergency Board today and works six days per week. He has one day off each week; however, his day off changes every week. (Ex. A, Ex. B at p. 30:22-24, 31:1, 5-7.) The shifts and days that Plaintiff works are subject to change because he is on call and fills in when needed. (Ex. B at p. 34:2-11.)

10. At all times relevant, Conrad Banda (Assistant Manger of Terminal Operations,

Hispanic), was Plaintiff's supervisor. (Ex. B at p. 49:5-6.)

### Abuse of Sick Days

11. In his Complaint, Plaintiff alleged that Mr. Banda treated white employees more favorably than black employees in relation to their sick time requests. (Compl. at ¶ 43(a).) According to Plaintiff, he called Mr. Banda on December 12, 2011 to request a sick day to ensure that he did not work a night shift on December 12 and be late to a medical procedure scheduled for December 13, 2011. (Ex. B at p. 38:3-9, 40:13-21.)

12. Unable to reach Mr. Banda, Plaintiff left a voicemail to inform Mr. Banda that he would be taking a sick day on December 12. (Ex. B at p. 41:1-10.) Plaintiff admitted that he called in sick on a day he was not sick "to eliminate the possibility of [] working overnight." (Ex. B at p. 38:3-17.) According to Plaintiff, Mr. Banda called him back that evening and allegedly told him that he was not authorized to take a sick day. (Ex. B at p. 36:24, 37:1.)

13. Mr. Banda testified that there is no reason why a request for a sick day would be denied. (Ex. C at p. 19:22-24, 20:1-3.) If a control operator wanted to take a sick day, he or she has to call the supervisor in charge to request the time off. (Ex. C at p. 18:6-22.)

14. After his interaction with Mr. Banda on December 12, 2011, Plaintiff filed an internal EEO Complaint or Values Line Complaint against Mr. Banda alleging that at 7:00 am that morning, he left Mr. Banda a message that he was calling off sick. (Exhibit D 2011 Values Line.) Plaintiff further alleges in his Values Line complaint that when Mr. Banda returned his call that evening, Mr. Banda told Plaintiff that Plaintiff was not authorized to be off if Plaintiff did not talk to Mr. Banda first. (*Id*.) During his deposition, Plaintiff agreed that he is responsible for notifying his manager that he is going to be off and calling in advance of layoffs. (Ex. B at p. 97:15-20.)

15. During his deposition, Plaintiff was asked and answered the following:

Q. Why were you being treated differently?

A. You know what, I don't know why I was being treated differently.

Q. You just feel that you were?

A. I feel that I were [sic] now the fact that these were all Caucasian and Latino, and I'm a black guy. You know, it would appear on the surface that would be the reason why. Now, I am not sure why.

(Ex. B at p. 78:24, 79:1-7.)

16. Plaintiff admitted that Mr. Banda has never said to him "Aaron Harris, you cannot take a sick day." (Ex. B at p. 71:14-16.) He also admitted that no one made a comment to him regarding his race; no one told him that he was treated differently with respect to sick days because of his race; and Mr. Banda never told Plaintiff that he would treat Plaintiff differently because of Plaintiff's race. (Ex. B at p. 79:11-24.)

17. On May 5, 2014, three years after Plaintiff filed his first Values Line complaint against Mr. Banda, Superintendent of Commuter Operations Arnold Robinson (African American), sent Plaintiff a letter entitled "Letter of Warning – Attendance." (Exhibit E Letter of Warning – Attendance 05/05/14.) The letter states "a recent review of your attendance history indicates you may be in violation of Union Pacific Attendance Policy." (*Id.*)

18. Even though Plaintiff did not have a set schedule, he acknowledged that Union Pacific's Clerical Attendance Policy ("Attendance Policy") applied to him in his position in 2011, in 2014, and currently. (Ex. B at p. 96:3-6.) In relevant part, the Attendance Policy states:

> As a Union Pacific employee, you were hired for and are expected to protect your job assignment on a full-time basis. "Full-time" means being available to work your assignment, whether regular or extra, whenever it is scheduled to work […] It is your responsibility to notify your manager, in advance of layoffs if possible, on personal or family issues that may affect your ability to work full time […] You may be considered in violation of this policy regardless of the explanation

offered if you are unable to work full time and protect all employment obligations […] Employees who do not work full-time, will be identified. Identification will include employees with:

- Frequent, or pattern of, layoffs around rest days.

- Frequent, or pattern of, holiday layoffs.

- Frequent or personal layoffs.

(Exhibit F Union Pacific Railroad Clerical Attendance Policy.)

19. After receiving the Letter of Warning on May 8, 2014, Plaintiff immediately filed his second Values Line complaint against Mr. Banda. (Exhibit G 2014 Values Line.) In his second Values Line complaint, Plaintiff stated that "it is impossible for him to never be sick[;] therefore, [Mr.] Banda should not get angry when he has to miss work due to illness." (*Id.*) During his deposition, Plaintiff was asked and answered the following:

Q: Okay. Walk me through why you made a values line complaint on May 8th 2014?

A: I believe I used a couple of sick days, and I was wrote up for using my sick days. [Mr. Banda] said I was abusing sick days.

Q: When you say wrote up, what do you mean?

A: Just that I was written – he writ [sic] a letter of – a disciplinary letter saying I was abusing sick days.

(Ex. B at p. 55:18-24, 56:1-2.) Plaintiff agreed that abusing sick times means using sick time for a purpose other than being sick such as constantly calling off sick and/or using sick days with off days or vacations. (Ex. B at p. 50:9-19.)

20. At the time Plaintiff received the Letter of Warning, he had taken one week of vacation from May 2 through May 6, 2014 and had called off sick for April 30 and May 1, two days before his scheduled vacation. (Ex. B at p. 105:21-24, 106:1-12, Exhibit H Lay Offs Vacancies for Employee.) Plaintiff admitted that before May 5, 2014, he has taken sick days and

5

has never received a similar warning letter. (Ex. B at p. 69:23-24, 70:1-4.) He further admitted that the May 5, 2014 warning letter is the only warning letter that he has received after taking a sick day. (Ex. B at p. 70:5-7.)

21. Plaintiff's attendance record further shows that he took a week of vacation from May 3, 2012 through May 7, 2012 and called in sick for May 8 and May 9, two days after his vacation was scheduled to end. (Ex. B at p. 103:15-24, Ex. H.) Plaintiff took a week of vacation from September 20, 2012 through September 24, 2012 and called in sick on September 19, the day preceding his vacation. (Ex. B at p. 104:2-10, Ex. H.) Plaintiff took a week of vacation from May 1, 2013 through May 6, 2013 and called in sick on May 7, the day after his vacation ended. (Ex. B at p. 104:11-21, Ex. H).

22. Plaintiff testified that after he received the Letter of Warning, no investigation was conducted, he was never charged with any formal discipline, suspended from work, docked any pay, or issued any kind of rule violation, his job assignment did not change, and he was still working the same Emergency Operator Board position. (Ex. B at p. 58:7-24, 59:1-9.)

23. Plaintiff maintains that Union Pacific employees M. L. "Mike" Di Paolo (Caucasian), Thomas Melson (Caucasian), Steve Dynaba (Hispanic), and Benny Mendoza (Hispanic) were absent for about 20 times a year and were not reprimanded. (Ex. B at p. 73:16-21.)

24. Mr. Di Paolo hired on at Union Pacific in 1988 and was a Tower Operator Director at the Commuter Operations Service Unit at all times relevant. (Exhibit I Di Paolo HR Report.)

25. Mr. Melson hired on at Union Pacific in 1978 and was a Tower Operator Director at the Commuter Operations Service Unit at all times relevant until he retired in November 2012.

(Exhibit J Melson HR Report.)

26. Mr. Dydyna hired on at Union Pacific in 1971 and was a Tower Operator Director at the Commuter Operations Service Unit at all times relevant until he died in 2014. (Exhibit K Dydyna HR Report.)

27. As directors, Mr. Di Paolo, Mr. Melson, and Mr. Dydyna were non-agreement employees, unlike Plaintiff who was an agreement employee. As non-agreement employees, they were not subject to the attendance policy that governed Plaintiff. Moreover, the three directors reported to Craig A. Lockhart. (Ex. I, Ex. J, Ex. K.)

28. Mr. Mendoza hired on the railroad in 2002 and was a Trackman at the Commuter Operations Service Unit at all times relevant. (Exhibit L Mendoza HR Report.) As a trackman, Mendoza was a member of the Engineering Department and reported to Fabian Graumann. (*Id.*)

29. Plaintiff agreed that none of the employees that he identified worked the same job as him, the Emergency Board, and that he did not know how many sick days they were entitled to in their positions. (Ex. B at p. 74:3-18, 75:17-19.)

**Fitness-For-Duty Evaluation**

30. On February 23, 2015, almost a year after he received the Letter of Warning, Plaintiff complained to Director of Terminal Operations Patrick "Jay" Michael (Caucasian) that the way he was working was bad for his health. (Ex. B at p. 122:6-9.) According to Plaintiff, his schedule was leaving him "exhausted." (Ex. B at p. 123:24, 124:1-9.) Plaintiff complained "if I work a couple nights, then sleep in, come back, work a couple of days, then go back to a couple of nights, go back to a couple of days, yes, my body is out of whack, and it's bad for my health." (Ex. B at p. 124:4-9.)

31. In the same conversation, Plaintiff told Mr. Michael that he was taking medication

7

that was making it unsafe for him to work, but refused to reveal the medication he was taking at the time. (Patrick J. Michael Deposition Exhibit M at p. 13:1-10.) As a result of this conversation, Mr. Michael referred Plaintiff for a Fitness for Duty ("FFD") evaluation. (Exhibit M at p. 12:22-25, 13:1-3.)

32. In order to ensure an employee can safely perform the essential functions of his or her job, Union pacific requires an employee subject to a FFD to provide the Department with his or her past medical records. (Exhibit N Medical Absence/Fitness For Duty.) Fitness for Duty evaluations may be requested when an employee's supervisor, or Health and Medical staff, becomes aware of medical conditions or behaviors indicating possible physical or mental impairment that could compromise safety. (*Id*.)

33. Mr. Michaels initiated the fitness for duty examination because of Plaintiff's complaints regarding an inability to work safely. (Ex. M at p. 13:11-14.)

34. Plaintiff was pulled out of service on February 24, 2015, and reinstated to full duty on April 15, 2015 to the same position and location. (Ex. A.) Plaintiff has remained on active duty ever since his reinstatement. (Ex. A.)

**Plaintiff's Equal Employment Opportunity Commission (EEOC) Charges**

35. On March 10, 2015, nearly a year after filing his second Values Line complaint against Mr. Banda, Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Committee for discrimination based on race, retaliation, and disability. (Exhibit O EEOC Charge.) Plaintiff alleged in his charge that

> "during [his] employment, [he has] been subjected to different terms and conditions of employment, including, but not limited to, having my requests for sick leave scrutinized and/or denied. In or around May 2014, I filed an internal complaint of racial discrimination. Subsequently, I have been placed on unpaid medical leave."

(*Id.*)

36. Plaintiff alleged that Mr. Banda discriminated against him because of his race and perceived disability because Mr. Banda "took Plaintiff out of service on February 23, 2015 for complaining about the constant change of shifts." (Compl. at ¶¶ 43(b), 48(a).) However, at his deposition, Plaintiff admitted "I don't know why I was pulled out of service." (Ex. B at p. 163:4.)

37. Plaintiff testified that when he asked Mr. Banda why he was being sent for fitness-for-duty, Mr. Banda said "I don't know what's going on." (Ex. B at p. 145:1-3.) Mr. Banda testified that he did not have any involvement in making the determination to pull Plaintiff from service or in the actual fitness-for-duty process. (Ex. C p. 36:11-16.)

38. Plaintiff was asked and answered the following, at his deposition:

Q: Okay. So my question was just do you know who made the decision to send you for a fitness for duty? Do you know? It's okay if you don't.

A: Via paperwork I've seen, it would appear to be Arnold Robinson.

Q: Okay.

A: Who I had never talked to.

Q: Okay. So other than seeing some paperwork, you don't know who?

A: I was thinking it was Jay Michael[], Mr. Michael[] who I had a conversation with.

(Ex. B at p. 140:23-24, 141:1-9.)

39. The Supervisor Initiated Fitness-For-Duty Request Form indicates that Jay Michael was the supervisor who "observed behaviors" and the manager making referral. (Exhibit P Fitness-For-Duty Request Form.)

Dated: August 30, 2018                    Respectfully submitted,

                                          UNION PACIFIC RAILROAD COMPANY

                              By:         _____
                                          Sarah-Joël M. Privert

Sarah-Joël M. Privert, #6325812
Brody E. Dawson, #6269617
Union Pacific Railroad Company
101 N. Wacker Dr., Suite 1920
Chicago, IL. 60606
Tel: (312) 777-2056
Fax: (877) 213-4433
smpriver@up.com
bedawson@up.com

10

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the above and foregoing instrument was properly forwarded to all counsel of record as listed below by:

\_\_\_\_\_ United States Mail, postage prepaid and sealed;

\_\_\_\_\_ United States Certified Mail, postage prepaid and return receipt requested;

\_\_\_\_\_ Hand Delivery;

\_\_\_\_\_ UPS / Next Day Air;

\_\_\_\_\_ Facsimile Transmission;

__X__ Local Rule 5.9 Electronic Filing (U.S.D.C., ND IL); and/or

\_\_\_\_\_ Email (pdf)

on August 30, 2018.

**John S. Bishof, Jr.**
Law Offices of John Bishof, P.C.
101 North Wacker Dr., Suite 200
Chicago, IL. 60606
Tel: (312 ) 630-2048
jsbishof@jsblegal.com

**Patricia N. Gerberich**
Law Office of John Bishof, PC
101 N. Wacker Drive, Suite 200
Chicago, IL 60606
Tel: 312 630 2048
pgerberich@jsblegal.com

*Sarah-Joël M. Privert*

_____
Sarah-Joël M. Privert