# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AARON HARRIS,             )
                                )
             Plaintiff,       )       Case No. 16-cv-11607
                                )
            v.             )       Judge Robert M. Dow, Jr.
                                )
UNION PACIFIC RAILROAD CO.,   )
                                )
             Defendant.     )
                                )
                                )

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's motion for summary judgment [42]. For the reasons set forth below, the motion [42] is granted in part and denied in part. The case is set for further status on October 9, 2019 at 9:00 a.m.

## I.     Background[1]

Defendant Union Pacific Railroad Company ("Union Pacific" or "Defendant") is a common carrier by rail in interstate commerce. [43, at ¶ 1.] Plaintiff Aaron Harris is an employee within the commuter operations service unit of Union Pacific in Chicago, Illinois. [*Id*. at ¶ 2.]

---

[1] Under Local Rule 56.1, "facts that go beyond what is fairly responsive to the movant's Local Rule 56.1(a)(3) assertions" must be made in the non-movant's Local Rule 56.1(b)(3)(B) response. *Buford v. Laborers' Int'l Union Local 269*, 2019 WL 184052, at *3 (N.D. Ill. Jan. 14, 2019). To the extent that Plaintiff's response to Defendant's Rule 56.1 statement includes additional facts not properly included under Local Rule 56.1, the Court disregards the facts. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (affirming district court's refusal to consider facts proposed in the plaintiff's Local Rule 56.1 where "response contained several extremely long, argumentative paragraphs, and in those paragraphs [plaintiff] simultaneously denied the veracity of [defendant's] proposed material facts and presented additional facts of his own"); see also *Eason v. Nolan*, 416 F. App'x 569, 570 (7th Cir. 2011) ("[T]he district court did not abuse its discretion when it disregarded the additional facts that [the non-movant] included in his [Local Rule 56.1(b)(3)(B)] response."). That being said, the Court still considered much of the underlying evidence referenced by Plaintiff, as noted by cites to the record documents below. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Plaintiff held various positions with Defendant until he was promoted to a tower operator in 2004. [*Id.*] Plaintiff remained in that position and believed that it was "a better job" than working in the yard because it was safer and paid more. [43-2 (Pl.'s Dep. Tr.), at 12-13.] A tower operator is responsible for the movement of trains within a train yard. [43, at ¶ 5.] A tower operator directs engineers, conductors, and hostlers in moving trains from point A to point B; controls signals; and ensures the safety of employees working on the tracks by putting trains on opposite tracks. [*Id.*]

Plaintiff worked on the Extra Board during his training for the tower operator position, which meant that he did not have a set schedule or worksite. [*Id.* at ¶ 7.] He was required to work five days a week at whatever tower and shift Defendant directed him to staff. [*Id.*] However, a mandatory rest time of 15 or 16 hours was required after Plaintiff worked an 8-hour shift. [45 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 7.] In 2005, Plaintiff transitioned to an Emergency Board position and remains in that position today. [43, at ¶ 8.] An Emergency Board tower operator fills temporary vacancies in tower operator positions. [*Id.*] As an Emergency Board tower operator, Plaintiff is responsible for filling in for someone who calls in sick, has an emergency, or is on vacation. [*Id.*] It also is Plaintiff's responsibility to assist at towers when required and/or when additional tower operators are needed temporarily. [*Id.*] At the time of the briefing of this motion, Plaintiff was working six days a week. [*Id.* at ¶ 9.] He has one day off each week; however, his day off changes every week. [*Id.*] The shifts and days that Plaintiff works are subject to change because he is on call and fills in when needed. [*Id.*] At all relevant times, Conrad Banda (Assistant Manager of Terminal Operations, Hispanic) was Plaintiff's supervisor. [*Id.* at ¶ 10.]

Plaintiff first had an issue with Banda relating to a December 2011 request from Plaintiff to take a sick day. Although the parties dispute the circumstances surrounding the December 2011 request, the details of the issue are not relevant to the Court's analysis. What is relevant is that

Plaintiff filed an internal EEO Complaint or Values Line Complaint against Banda in relation to the request. [43-4 (Def.'s Ex. D).] Although the report from the complaint indicates that Plaintiff stated that other employees call in sick more often without any problems [*id*.], nothing in the complaint references race or any other protected status.

In this case, Plaintiff complains that he and other African-American employees were treated differently than non-African-American employees by Banda in connection with their use of sick time. When Plaintiff was asked why he believed that he was being treated differently with respect to sick time, Plaintiff responded: "You know what, I don't know why I was being treated differently." [*Id*. at ¶ 15.] When asked whether he just felt that he was being treated differently, Plaintiff responded: "I feel that I were [sic] not the fact that these were all Caucasian and Latino, and I'm a black guy. You know, it would appear on the surface that would be the reason why. Now, I am not sure why." [*Id*.] Plaintiff admits that Banda never told him that he could not take a sick day. [*Id*. at ¶ 16.] Plaintiff also admits that nobody ever made a comment to Plaintiff about his race. [43-2 (Pl.'s Dep. Tr.), at 79.] Plaintiff further admits that nobody ever told him that he was treated differently with respect to sick days because of his race. [*Id*.] However, Plaintiff testified that he started having issues with Banda when he started pressing Plaintiff about his use of sick days. For example, when Plaintiff would request a sick day, Banda would ask Plaintiff what was wrong with him and why he needed a sick day.[2] [*Id*. at 43-44.] On May 5, 2014, three years after Plaintiff filed his first complaint against Banda, Superintendent of Commuter Operations Arnold Robinson (an African American), sent Plaintiff a letter titled "Letter of Warning

---

[2] Defendant asserts that these statements are inadmissible hearsay. Given that the statements are from one of Defendant's supervisors, the statements would likely qualify as a statement of a party opponent and therefore would not constitute hearsay. *Mister v. Ne. Illinois Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009). In any event, the statements are not being offered for the truth of the matters asserted. Fed. R. Evid. 801(c)(2).

– Attendance." [43 at ¶ 17.] Banda admitted to initiating the warning letter to Plaintiff regarding his attendance record. [46, at ¶ 3.] The letter states: "[A] recent review of your attendance history indicates you may be in violation of Union Pacific Attendance Policy." [*Id*.] Even though Plaintiff did not have a set schedule, he acknowledges that Union Pacific's Clerical Attendance Policy (the "Attendance Policy") applied to him at all relevant times. In relevant part, the Attendance Policy states:

> As a Union Pacific employee, you were hired for and are expected to protect your job assignment on a full-time basis. "Full-time" means being available to work your assignment, whether regular or extra, whenever it is scheduled to work * * * It is your responsibility to notify your manager, in advance of layoffs if possible, on personal or family issues that may affect your ability to work full time * * * You may be considered in violation of this policy regardless of the explanation offered if you are unable to work full time and protect all employment obligations * * * Employees who do not work full-time, will be identified. Identification will include employees with:
>
> • Frequent, or pattern of, layoffs around rest days.
>
> • Frequent, or pattern of, holiday layoffs.
>
> • Frequent or personal layoffs.

[*Id*. at ¶ 18.] A warning letter is issued when an employee shows a frequent number of layoffs-two or more or three or more in a 90-day period. [46, at ¶ 3.] During his deposition, Plaintiff testified that abusing sick time meant constantly calling off sick or taking sick days with "off days." [43-2 (Pl.'s Dep. Tr.), at 50.] Plaintiff further agreed that taking sick time for a purpose other than being sick would qualify as abusing sick time. [*Id*.] Although Plaintiff agreed that tacking sick days onto off days would qualify as abusing sick time, he testified that he did not know whether tacking sick days onto vacation days would qualify as abusing sick time. [*Id*.]

Plaintiff testified that after he received the warning letter, no investigation was conducted. [43. at ¶ 22.] Plaintiff never was formally disciplined, suspended from work, docked any pay, or

issued any kind of rule violation. [*Id.*] Furthermore, his job assignment did not change. [*Id.*] After receiving the warning letter on May 8, 2014, Plaintiff immediately filed his second Values Line complaint against Banda. [43-7 (Def.'s Ex. G).] In his second Values Line complaint, Plaintiff stated that "it is impossible for him to never be sick. Therefore Banda should not get angry when he has to miss work due to illness." [*Id.*]

At the time Plaintiff received the warning letter, he had taken one week of vacation from May 2 through May 6, 2014 and had called off sick for April 30 and May 1, the two days before his scheduled vacation. [43, at ¶ 20.] The May 5, 2014 warning letter is the only warning letter that Plaintiff has received after taking a sick day. [*Id.*] Plaintiff's attendance records further show that he took a week of vacation from May 3, 2012 through May 7, 2012 and that called in sick for May 8 and May 9, the two days after his vacation was scheduled to end. [*Id.* at ¶ 21.] Plaintiff took a week of vacation from September 20, 2012 through September 24, 2012, and he called in sick on September 19, the day preceding his vacation. [*Id.*] Plaintiff took a week of vacation from May 1, 2013 through May 6, 2013, and he called in sick on May 7, the day after his vacation ended. [*Id.*]

When asked about employees who Plaintiff contends used more sick time than him, Plaintiff identified M. L. "Mike" Di Paolo, Thomas Melson, Steve Dynaba, and Benny Mendoza. [43-2 (Pl.'s Dep. Tr.), at 73.] Defendant produced reports indicating that the first three of these employees (Di Paolo, Melson, Dynaba) were supervised by Craig A. Lockhart at the time the reports were generated. [43-9 (Def.'s Ex. I); 43-10 (Def.'s Ex. J); 43-11 (Def.'s Ex. K).] Defendant produced a similar report indicating that Mendoza was supervised by Fabian Graumann at the time the report was generated. [43-12 (Def.'s Ex. L).] However, these reports were not generated during the relevant time period. The Court therefore cannot rely on the then current

supervisor listed in these reports to establish who supervised these employees during the relevant time period. Still, with respect to Di Paolo, the report relating to him indicates that Lockhart was Di Paulo's supervisor as far back as 1996. [43-9 (Def.'s Ex. I), at 11 (noting Lockhart as Di Paulo's supervisor at the time of disciplinary events occurring in 1996, 2010, and 2014). ] Plaintiff has not identified any additional evidence regarding who supervised these employees during the relevant time period. [45 (Pl.'s Resp. to Def.'s Stmt. of Facts), at ¶ 27.] It therefore is unclear from the record whether Melson, Dynaba, and Mendoza had the same supervisor as Plaintiff during the relevant time period. It is undisputed, however, that none of the comparators identified by Plaintiff worked the same job as him, as none of them were on the Emergency Board. [43, at ¶ 29.] Furthermore, Plaintiff testified that he did not know the number of sick days to which these employees were entitled. [*Id*.]

After night-shift tower operator Steve Dedina passed away, Banda started assigning Plaintiff and another employee to work Dedina's shifts. [43-2 (Pl.'s Dep. Tr.), at 124-27.] This resulted in Plaintiff being assigned erratic shift schedules, switching back and forth between day and night shifts. [*Id*. at 124.] On February 23, 2015, Plaintiff complained to Patrick "Jay" Michael about the way Banda was scheduling Plaintiff. Plaintiff testified that he told Michael that the schedule was bad for his health. [*Id*. at 123.] Plaintiff also testified that his schedule was leaving him exhausted [*id*. at 123-25], but it is not clear from the record whether Plaintiff told Michael that he was exhausted. Although Michael could not recall the exact words that Plaintiff used during this discussion, he testified that Plaintiff said that his schedules were "starting to impact [him] doing [his] job safe[ly]" or words close to that effect. [46-6 (Michael Dep. Tr.), at 23.] Plaintiff

denies that he ever said that he could not perform his job safely. [46, at ¶ 16.][3] For the purposes of this motion, the Court credits Plaintiff's denial.

Michael also testified that Plaintiff stated during this discussion that he was taking medication but refused to reveal what medication he was taking at the time. [46-6 (Michael Dep. Tr.), at 20.] However, Plaintiff denies that he made such a statement. Plaintiff contends that it was Michael who first raised the issue of medication. [*Id*. at 132.] Plaintiff further testified that he was not taking any medication at that time that made it unsafe for him to work. [43-2 (Pl.'s Dep. Tr.), at 132-33.] Again, when considering Defendant's motion for summary judgment, the Court must credit the testimony of Plaintiff. Michael testified that he referred Plaintiff for a Fitness for Duty ("FFD") evaluation as a result of this conversation. [43-13 (Michael Dep. Tr.), at 12-13.] According to Defendant's "Medical Absence/Fitness for Duty" policy, "[FFD] evaluations may be requested when an employee's supervisor * * * becomes aware of medical conditions or behaviors indicating possible physical or mental impairment that could compromise safety." [46, at ¶ 11.] Defendant also has a "Fitness for Duty Evaluations" policy, which states in relevant part:

**Fitness-For-Duty Evaluations**

***

A Fitness-for-Duty Evaluation may be initiated by HMS and/or a Supervisor.

***

**Supervisor Initiated**

Supervisors have the ability to request a Fitness-for-Duty evaluation on credible information which raises a concern about the employee's ability to safely perform his/her job duties. The supervisor may remove the employee from service during the review period.

---

[3] The Court notes that the cited portion of Plaintiff's deposition does not support this assertion. However, Defendant does not deny that Plaintiff testified that he "never told Mr. Michael that he could not safely perform his job, he told Mr. Michael switching shifts was bad for his health." [50, at ¶ 15.] The Court therefore assumes that such testimony can be found elsewhere in Plaintiff's deposition transcript.

[*Id.* at ¶ 9.] When asked what "credible information" means to him, Michael testified that "it means any information that a manager has that is substantial enough to warrant a look into whether the employee can safely discharge his duties." [*Id.* at ¶ 10.] On February 23, 2015, Plaintiff was pulled out of service for an FFD evaluation on the same day that he complained to Michael.[4] [43, at ¶ 34.] Plaintiff fully was reinstated to the same position at the same location on April 15, 2015. [*Id.*] Plaintiff has remained on active duty ever since his reinstatement. [43, at ¶ 34.] Plaintiff testified that he was not paid while he was taken out of service. [43-2 (Pl.'s Dep. Tr.), at 145-46.]

When asked what he went through during the two months that he was out of service, Plaintiff testified:

> Emotionally, yeah, it was kind of – it was really bad for my family because, of course, I'm kind of upset with the world for the most part because I don't know why I was pulled out of service, why my job was – in my mind, my job was taken away from me, and I don't know if I'm fired in actuality because I don't know what's going on. So I'm – me and my sister fell out because – based on me – I'm kind of nasty. So I was nasty to a couple of the neighbors because, yeah, I don't know what's going on. I'm a little angry right now. I'm coming to work every day doing everything that's asked of me and think I'm a model employee, and all the sudden it was snatched from me. No probable cause. To this day, as I said, I don't know – I don't know what happened. * * * Not just financially, I mean – okay. I didn't have no money, but I can figure out how – I'm going to take care of my family some kind of way so I borrowed some money.

[43-2 (Pl.'s Dep. Tr.), at 163.] Plaintiff testified that when he asked Banda why he was subject to an FFD evaluation, Banda said "I don't know what's going on." [43, at ¶ 37.] Plaintiff also repeatedly asked his FFD nurse for an explanation as to why he was pulled from service. [46-11 (Pl.'s Ex. 10).] The Supervisor Initiated Fitness-For-Duty Request Form indicates that Michael was the supervisor who "observed behaviors" and the manager making the referral. [43, at ¶ 39.]

---

[4] Defendant originally asserted that Plaintiff was pulled from service on February 24, 2015. However, Defendant now does not dispute Plaintiff's contention that he was pulled from service on February 23, 2015. [49, at ¶ 34.] Regardless, the discrepancy is not relevant to any issue before the Court.

On the portion of the FFD Request Form asking for the reason for the request, Michael marked (1) absenteeism, and (2) other—employee stated his alternating schedules and his medication was making his health worse and impacting his ability to work safely. [46, at ¶ 13.] Michael testified that he marked "absenteeism" as a reason because Banda informed Michael that Plaintiff's attendance had not been where it usually was in the weeks or months prior to February 23, 2015. [*Id*. at ¶ 14.] However, Michael did not substantiate Banda's attendance claim. [*Id*.] In the 90 days before February 23, 2015, Plaintiff only took two sick days—on February 14, 2015 and December 17, 2014. [*Id*. at ¶ 17.] When asked whether he had enough information to request an FFD evaluation excluding any attendance problems, Michael stated: "Once [Plaintiff] said that he couldn't perform his job safely, yes. At that point, I really [had] no choice." [46-6 (Michael Dep. Tr.) at 23.] Michael consulted with and filled out the form with Banda either in person or on the phone. [46, at ¶ 16.] However, Banda was not involved in making the decision to pull Plaintiff out of service. [*Id*.] Nor was Banda otherwise involved in the FFD evaluation process.

Dr. John Charbonneau—who performs FFD evaluations for Defendant—conducted the FFD evaluation of the Plaintiff, which included a review of the available medical information and the circumstances of the referral. [46, at ¶¶ 18-19.] The fitness-for-duty nurse involved with Plaintiff's case was Theresa Rodino. [*Id*. at ¶ 22.] Rodino assisted in obtaining information, obtaining requested records, and interviewing Plaintiff. [*Id*.] An electronic medical record system called eHealthSafe documented all comments made by Rodino, Dr. Charbonneau, or anyone who was involved in the FFD evaluation. [*Id*.] Dr. Charbonneau reviewed the information submitted by Rodino in the eHealthSafe system on February 26, 2015. [*Id*. at ¶ 23.] This included a summary of Rodino's conversation with Plaintiff. [*Id*.] Dr. Charbonneau testified that he also reviewed the supervisor-initiated FFD request form that Michael completed regarding Plaintiff. [*Id*. at ¶ 24.]

Since a reason for the referral was absenteeism, Dr. Charbonneau wanted to know how long the absenteeism had been occurring and asked for further clarification on the issue. [*Id.*] Specifically, Dr. Charbonneau asked Rodino to discuss Plaintiff's attendance problems with Plaintiff's manager. [*Id.* at ¶ 25.] Dr. Charbonneau suggested that it would be helpful to get Plaintiff's work history for the last 3 to 6 months. [*Id.*] However, Dr. Charbonneau never received Plaintiff's work history and there is no indication in the eHealthSafe record that Rodino talked to Plaintiff's manager about Plaintiff's purported absenteeism. [*Id.* at ¶ 26.]

Plaintiff submitted a note to the Defendant's Health and Medical Department from his primary care physician, Dr. Yeturu Sudhakar, on March 6, 2015. [*Id.* at ¶ 29.] The note stated the Plaintiff is in good health with no medical work restrictions. [*Id.*] Plaintiff submitted another medical note from Dr. Arnulfo Vielgo on or about April 8, 2015. [*Id.*] That note stated that Plaintiff had received treatment on April 8, 2015 and that Plaintiff could resume work immediately without any restrictions. [*Id.*] The note also stated that Plaintiff could safely perform his duties and should be able to work an alternating schedule. [*Id.*] Dr. Charbonneau opined that a note from a treating physician is not an adequate basis to make an FFD determination because the doctor does not know about the workplace problems and the observations made. [*Id.* at 30.]

Dr. Charbonneau reviewed Plaintiff's medical records, which included detailed notes from Dr. Yeturu. [*Id.* at ¶ 31.] Still, Dr. Charbonneau believed an occupational medical exam was warranted because of Michael's description of Plaintiff's behavior at work. [*Id.*] Dr. Charbonneau believed that the medical records alone did not give him a sufficient impression of Plaintiff's then-existing medical conditions fully accounting for what was observed at work and for Plaintiff's job requirements. [*Id.*] Dr. Charbonneau also believed that the possibility Plaintiff's medical conditions were not properly being controlled warranted a medical exam. [*Id.*]

Dr. Charbonneau never talked to Plaintiff's managers. [*Id*. at ¶ 32.] His basis for "what was observed" at work was the supervisor-initiated FFD request form and the notes that Rodino made in the eHealthSafe record about her conversation with the Plaintiff. [*Id*.] Dr. Charbonneau wrote a letter to Dr. David Marder on April 1, 2015 requesting that he perform a medical exam on Plaintiff to determine if there were any significant medical conditions that would serve as a barrier to his ability to safely perform his normal job activities. [*Id*. at ¶ 34.] Dr. Marder interviewed and examined Plaintiff on April 2, 2015. [*Id*.] In a detailed summary of his examination and findings, Dr. Marder determined that Plaintiff did not have any medical problems that would affect his ability to safely perform his job. [*Id*. at ¶ 35.] After reviewing Dr. Marder's letter, Dr. Charbonneau concluded that Plaintiff was medically fit for duty and asked Rodino to close the case. [*Id*. at ¶ 36.]

On March 10, 2015, nearly a year after filing his second Values Line complaint against Banda, Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Committee ("EEOC") for discrimination based on race, retaliation, and disability. [*Id*. at ¶ 35.] Plaintiff made the following allegations in his charge:

> During my employment, I been subjected to different terms and conditions of employment, including, but not limited to, having my requests for sick leave scrutinized and/or denied. In or around May 2014, I filed an internal complaint of racial discrimination. Subsequently, I have been placed on unpaid medical leave.

[*Id*.; see also 43-15 (Def.'s Ex. O).] Plaintiff alleges in this case that Banda discriminated against him because of his race and perceived disability because Banda "took Plaintiff out of service on February 23, 2015 for complaining about the constant change of shifts." [43, at ¶ 36.] However, during his deposition, Plaintiff testified that he did not "know why [he] was pulled out of service." [*Id*.]

A letter dated April 22, 2015 was sent to plaintiff from United Healthcare. United Healthcare provides health coverage to Plaintiff. [46, at ¶ 37.] The letter stated that additional information was needed to update Plaintiff's coverage and a "Start date of injury and estimated return to work date on your proof of disability * * *" is checked off. [*Id.*] The letter further stated that a blank disability form was enclosed. [*Id.*] The disability form stated: "We are in receipt of information from your employer indicating that you stopped working because you are disabled." [*Id.* at ¶ 38.] The form further stated: "In order for your health coverage to continue, we must have the proof of your disability below completed by your attending physician." [*Id.*] Plaintiff sent the letter and disability form to Theresa Rodino. [*Id.* at ¶ 39.] The Union Pacific Medical Director's file contained the April 22, 2015 letter from United Healthcare to Plaintiff. [*Id.*] Although the disability form stated that it must be filled out an attending physician, UP Medical Director Dr. John Holland completed the form, stating that Plaintiff had been disabled from his occupation from February 26, 2015 to April 15, 2015. [*Id.*]

Plaintiff brings disability discrimination, race discrimination, and retaliation claims against Defendant. [43, at ¶ 3.] Before the Court is Defendant's motion for summary judgment [42] on those claims.

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*

*v. Harris*, 550 U.S. 372, 380 (2007).  The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  With each motion for summary judgment filed pursuant to Rule 56 "the moving party shall serve and file—(1) any affidavits and other materials referred to in Fed. R. Civ. P. 56(e); (2) a supporting memorandum of law; and (3) a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law[.]"  LR 56.1 (N.D. Ill.).  The statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." *Id*.

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp.*, 477 U.S. at 323. In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III. Analysis

### A. ADA Discrimination Claim

#### 1. Regarded As

Defendant moves for summary judgment on Plaintiff's ADA claim, arguing that Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that Defendant regarded Plaintiff as having a disability. The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). To succeed under the "regarded as" prong, Plaintiff must "establish [that] he was subject to a prohibited employment action 'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'"[5] *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 886-87 (7th Cir. 2019) (quoting 42 U.S.C.

---

[5] Defendant correctly stated the law on this point in its opening brief. However, in its reply, Defendant argues that the perceived physical or mental impairment must substantially limit a major life activity.

§ 12102(3)(A)).  Here, Plaintiff contends that Defendant regarded him as having a disability because—during the FFD evaluation process—Michael represented that he believed Plaintiff was unable to safely perform his job.  Specifically, Michael represented that Plaintiff stated that "his alternating schedules and his medication was making his health worse and impacting his ability to work safe[ly]."  [46, at ¶ 13.]

Plaintiff's opening brief correctly states the law under the ADAAA—that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  *Pinkston v. City of Chicago*, 2017 WL 4340155, at *7 (N.D. Ill. Sept. 29, 2017) (quoting 42 U.S.C. § 12102(3)(A)) (internal quotation marks omitted).  However, Defendant's opening and reply briefs fail to address whether Plaintiff was regarded as having a qualifying impairment.  Instead, Defendant focuses on whether Defendant believed that Plaintiff had an impairment that substantially limited a major life activity—here, the life activity of working.  However, this is the incorrect legal standard following the ADAAA, which amended the ADA "to make clear an individual can be 'regarded as' having an impairment 'whether or not the impairment limits or is perceived to limit a major life activity.'"  *Richardson*, 926 F.3d at 888 (quoting 42 U.S.C. § 12102(3)(A)).  Plaintiff's response similarly focuses on whether he was regarded as having an impairment that limits or is perceived to limit a major life activity.  Because the parties do not address the correct legal standard, the Court denies Defendant's motion for summary judgment on Plaintiff's ADA claim for failure to establish that he was "regarded as" having a disability.

## 2.    *Adverse Action*

Defendant also moves for summary judgment on Plaintiff's ADA claim because—according to Defendant—the request that Plaintiff undergo an FFD evaluation cannot be viewed as an adverse employment action.  Plaintiff responds that being taken out of service for two months while his FFD evaluation was pending constitutes an adverse action under the ADA.[6]  "An adverse employment[.] action must be materially adverse to be actionable, meaning more than a mere inconvenience or an alteration of job responsibilities."[7]  *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001) (internal quotation marks and citation omitted).  Plaintiff testified that he was not paid while he was taken out of service.  [43-2 (Pl.'s Dep. Tr.), at 145-46.] Suspension without pay is an actionable adverse action under the ADA.[8]  *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005).  Although Plaintiff indicated that the issue of whether he is entitled to pay is in mediation, any back-pay award would not negate the fact that Plaintiff's suspension was an adverse action under the ADA.  *Phelan v. Cook Cty.*, 463 F.3d 773, 780 (7th Cir. 2006), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) ("[T]he reinstatement of an employee after a lengthy suspension from work does not prevent the employee from pursuing Title VII claims, even where back pay was awarded.").  Accordingly,

---

[6] Defendant cites to *Freelain v. Village of Oak Park* for the proposition that "[r]equiring a medical evaluation to assess an employee's ability to safely return to work is not an adverse employment action." 2016 WL 6524908, at *9 (N.D. Ill. Nov. 3, 2016), aff'd sub nom. *Freelain v. Vill. of Oak Park*, 888 F.3d 895 (7th Cir. 2018).  However, as Plaintiff makes clear, he does not contend that the examination itself is the adverse action.  Rather, Plaintiff challenges the fact that he was not working for two months while the evaluation was pending.  *Freelain* does not address whether that challenged action constitutes an actionable adverse action under the ADA.

[7] The Court notes that the standard is the same under Title VII.  *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) ("[A]n adverse action must materially alter the terms or conditions of employment to be actionable[.]"  (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006))).  The Court therefore looks at both ADA and Title VII cases in this analysis.

[8] Although the parties do not refer to Plaintiff's being taken out of service as a suspension, they do not identify any facts indicating that this would be an incorrect characterization.

the Court denies Defendant's motion for summary judgment on Plaintiff's ADA claim for failure to establish an actionable adverse action.

### 3. Pretext

Finally, Defendant argues that Plaintiff's ADA claim fails because Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that the proffered reason for initiating the FFD evaluation was pretextual. "[T]he ultimate question in a discriminatory employment termination case is '[w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he [was not disabled], and everything else had remained the same.'" *Graham v. Arctic Zone Iceplex, LLC*, 930 F.3d 926, 929 (7th Cir. 2019) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)). "One way to demonstrate this is by showing that the stated reasons for the firing were pretextual." *Id.* (citing *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737-38 (7th Cir. 2013)). "In evaluating pretext, 'the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge.'" *Id.* (quoting *Monroe v. Ind. Dep't of Trans.*, 871 F.3d 495, 505 (7th Cir. 2017)).

Here, Defendant asserts that Michael initiated the FFD evaluation because Plaintiff raised concerns about his ability to perform his work safely. However, Plaintiff testified that he never told Michael that he was unable to perform his work safely. Rather, according to Plaintiff, he merely told Michael that his schedule was bad for his health. [43-2 (Pl.'s Dep. Tr.), at 123.] Furthermore, although Michael testified that Plaintiff mentioned that he was taking medication, Plaintiff testified that it was Michael who first asked about whether Plaintiff was taking any medication. Plaintiff also testified that he was not taking any medications that would have affected his ability to perform his job safely. Under Defendant's policy, "[FFD] evaluations may be

requested when an employee's supervisor * * * becomes aware of medical conditions or behaviors indicating possible physical or mental impairment that could compromise safety." [46, at ¶ 11.] Crediting Plaintiff's testimony, which the Court must do on Defendant's motion for summary judgment, the Court cannot say as a matter of law that Michael honestly believed that Plaintiff had any medical conditions or behaviors indicating possible physical or mental impairment that could compromise safety. Although an employer may inquire into the health of its employees when "there are legitimate concerns about employee and public safety," *Davis-Durnil v. Vill. of Carpentersville, Ill.*, 128 F. Supp. 2d 575, 580 (N.D. Ill. 2001), a reasonable jury could credit Plaintiff's testimony and on that basis conclude that Michael's concerns here were not legitimate because he fabricated statements by Plaintiff to support his initiation of the FFD evaluation.

Defendant further argues that the ADA expressly permits an employer to require medical examinations or make inquiries of employees as long as the such examinations or inquiries are job related and consistent with business necessity. "Section 12112(d)(4)(A) of the ADA prohibits covered entities from requiring a medical examination or inquiring whether an 'employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.'" *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009) (quoting 42 U.S.C. § 12112(d)(4)(A)). "The ADA also allows inquiries 'into the ability of an employee to perform job-related functions.'" *Id*. (quoting 42 U.S.C. § 12112(d)(4)(B). Under Section 12112, "[a]n employer bears the burden of establishing that an examination is consistent with business necessity, and that burden is quite high." *Wright v. Illinois Dep't of Children & Family Servs.*, 798 F.3d 513, 523 (7th Cir. 2015) (internal citations and quotation marks omitted). "An employer must show that the asserted business necessity is vital to the business, as opposed to a mere expediency." *Id*. (internal

quotation marks and citation omitted). "In addition, the examination must 'genuinely serve[ ] the asserted business necessity and * * * must be a reasonably effective method of achieving the employer's goal.'" *Id*. (quoting *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003)). "Courts consequently require that an employer provide 'significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'" *Wright*, 798 F.3d at 523 (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)).

However, Defendant does not cite to any cases indicating that any time an evaluation is permitted under Section 12112(d)(4)(A), there can be no finding of pretext for the purposes of an ADA discrimination claim. Furthermore, because Defendant did not raise this provision until its reply brief—thus denying Plaintiff an opportunity to respond to it—Defendant waived any argument relating to this provision at the summary judgment stage. *Billhartz v. Comm'r*, 794 F.3d 794, 801 (7th Cir. 2015) ("[I]t is well-settled that arguments first made in the reply brief are waived." (quoting *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007)). In any event, Defendant has not satisfied its heavy burden on this issue as a matter of law because a reasonable jury could conclude that Defendant lacked significant evidence that could cause a reasonable person to inquire as to whether Plaintiff still was capable of performing his job. Again, Plaintiff contends that he never made the statements upon which Michael purportedly relied to initiate the FFD evaluation process. Accordingly, the Court must deny Defendant's motion to dismiss Plaintiff's ADA claim for failure to establish pretext.

### B. Statute of Limitations

Defendant moves for summary judgment on certain of Plaintiff's Title VII claims as barred by the statute of limitations. Title VII claims "must be filed within 300 days of the alleged

discriminatory act or unlawful practice." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 890 (7th Cir. 2016) (42 U.S.C. § 2000e-5(e)(1)). According to Defendant, Plaintiff's complaint and deposition testimony refer to purported instances of discrimination, retaliation, and/or harassment dating back to December of 2011. Because Plaintiff filed his charge of discrimination with the EEOC on March 10, 2015, Plaintiff argues that any Title VII claims based on conduct occurring before May 14, 2014 are time-barred. The Court agrees. Accordingly, to the extent that Plaintiff seeks to bring Title VII claims based on conduct occurring before May 14, 2014, the Court grants Defendant's motion for summary judgment on such claims.

Still, Plaintiff also brings claims under Section 1981. Defendant does not contend that Plaintiff's claims are untimely under Section 1981. Instead, Defendant argues that "charges of racial harassment by one's employer are not actionable under § 1981." *Guerrero v. Preston Trucking Co.*, 1989 WL 157727, at *4 (N.D. Ill. Dec. 21, 1989). However, that decision relied upon *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), which was superseded in relevant part by statute. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 450 (2008) ("Congress passed the Civil Rights Act of 1991, 105 Stat. 1071, with the design to supersede *Patterson*."). Accordingly, to the extent that Plaintiff brings claims under Section 1981, the Court denies Defendant's motion for summary judgment on those claims as time-barred.

## C.      Race Discrimination Claim

Defendant also moves for summary judgment on Plaintiff's race discrimination claim for failure to identify sufficient evidence of discrimination.[9] Plaintiff argues that he has established

---

[9] The Court notes that Defendant relies on the now defunct "convincing mosaic" analysis. The Seventh Circuit abandoned the convincing mosaic legal standard in *Ortiz v. Warner Enterprises, Inc.*, which held that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." 834 F.3d 760, 765 (7th Cir. 2016). The Court therefore does not use the direct versus indirect analysis advanced by Defendant.

his *prima facie* case of racial discrimination under *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under the *McDonnell-Douglas* framework, Plaintiff must establish that (1) [he] is a member of a protected class, (2) [he] was meeting [his employer's] legitimate expectations, (3) [he] suffered an adverse employment action, and (4) similarly situated employees outside of [his] protected class were treated more favorably." *Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019). Defendant argues that Plaintiff fails to show that similarly situated employees outside of his protected class were treated more favorably.

Plaintiff purports to bring a race discrimination claim based on Banda's harassment and intimidation of African Americans regarding the use of sick time. To the extent that Plaintiff seeks to bring a race discrimination claim based on treatment of individuals other than himself, Plaintiff's discrimination claim fails, as the Court must "look for evidence of intentional discrimination directed at [Plaintiff]."[10] *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990). With respect to instances of purported discrimination directed at Plaintiff, Plaintiff contends that he was harassed and discriminated against when (1) Banda intimidated Plaintiff into not requesting one of his accumulated sick days on December 12, 2011, (2) Banda harassed Plaintiff for taking his second and third sick day of the 2014 calendar year when he initiated the issuance of the warning letter in connection with Plaintiff's April 30 and May 1, 2014 absences, and (3) Banda harassed Plaintiff by marking him sick in October 2014 when he actually was on call and ready to work. [47, at 9-10.]

Assuming that this conduct amounts to an adverse action sufficient to satisfy the *McDonnell-Douglas* framework—which is unlikely in the Court's view—Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that similarly situated employees

---

[10] Even if Plaintiff could bring a claim based on conduct directed at other individuals, Plaintiff's claim still would fail for the reasons discussed below.

outside of Plaintiff's protected class were treated more favorably. "To be similarly situated to another employee, [Plaintiff] must show that the employee is directly comparable in all material respects." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). The Court considers "all relevant factors in making this determination, including whether the similarly situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014).

Plaintiff asserts that the Caucasian and Hispanic tower operators—Mike Di Paolo, Thomas Melson, Steve Dynaba, and Benny Mendoza—were not harassed or sent warning letters when they requested sick days off. [*Id*. at 10.] In support of this assertion, Plaintiff contends that he looked up the tower operators' vacancies (*i.e.*, absences) on Defendant's computer system and was able to see that those tower operators took more sick days than Plaintiff and were not harassed or sent warning letters. [*Id*.] However, these individuals had a different position than Plaintiff—they were not on the Emergency Board like Plaintiff. Because an Emergency Board tower operator is responsible for filling in for someone who calls in sick, has an emergency, or is on vacation, it may be more burdensome on Defendant if an Emergency Board tower operator violates the Attendance Policy. Plaintiff has not identified any evidence indicating that Banda supervised the comparators identified by Plaintiff.[11] These individuals appear to be subject to the same attendance policy. Still, although Plaintiff asserts that these individuals were not harassed or sent warning

---

[11] As discussed above, Defendant cited Human Resources reports for the identified comparators that were generated on August 14, 2018 indicating that Lockhart was their supervisor. Plaintiff noted that these reports do not reflect who was supervising the comparators during the relevant time period. However, Di Paolo's disciplinary history indicates that Lockhart was his supervisor as far back as 1996. [43-9, at 11.] Plaintiff did submit a bulletin indicating that Lockhart would be the new supervisor for the control operators effective June 1, 2015. [46-22 (Pl.'s Ex. 21).] However, this document also does not establish who supervised the comparators identified by Plaintiff during the relevant time period.

letters, Plaintiff does not cite to any admissible evidence in support of that assertion. Although Plaintiff's deposition testimony makes that assertion, Plaintiff did not provide any evidentiary foundation for that testimony,[12] which the Court therefore disregards. *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998) (affirming exclusion of statements in affidavit that lacked foundation and concerned matters not within the affiant's persona knowledge). In sum, Plaintiff has not identified sufficient evidence for a reasonable jury to conclude that similarly situated employees outside of Plaintiff's protected class were treated more favorably.[13]

### D. Retaliation Claim

Defendant moves for summary judgment on Plaintiff's retaliation claim. "To make out a *prima facie* case of retaliation under Title VII, [Plaintiff] must establish that: 1) [he] engaged in statutorily-protected expression; 2) [he] suffered an adverse action by [his] employer; and, 3) there is a causal link between the protected expression and the adverse action." *O'Donnell v. Caine Weiner Co., LLC*, 935 F.3d 549, 553 (7th Cir. 2019) (citation and internal quotation marks omitted).

Defendant argues that Plaintiff failed to establish that he engaged in statutorily-protected expression. "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th

---

[12] For example, Plaintiff does not identify any evidentiary basis for knowing whether the supervisor(s) of these employees made similar objectionable comments to these employees when they requested sick days. Nor does Plaintiff identify any evidentiary basis for knowing whether these employees ever received a warning letter.

[13] Plaintiff's brief address the *McDonnell-Douglas* framework discussed above. Plaintiff does not indicate that he is seeking to bring a hostile work environment claim, so the Court does not address that legal theory.

Cir. 1997)). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* (citations omitted). Still, in an interview with Lockhart regarding his complaints, Plaintiff indicated that he felt as though Banda showed favoritism towards other control operators but was rude and disrespectful to Plaintiff and Antonio Johnson—both African Americans. [46-20 (Pl.'s Ex. 19).] Defendant does not contend that the complaint made in the interview would be insufficient to establish a connection to a protected class. Rather, Defendant contends that Plaintiff's Value Line complaints themselves should have included this information because "[t]he applicable law clearly states that an internal complaint with an employer 'must indicate the discrimination occurred because of * * * race.'" [48, at 12 (citing *Tomanovich*, 457 F.3d at 662).] However, Defendant fails to explain why the verbal complaint to Lockhart itself does not qualify as statutorily protected activity. Because this argument is underdeveloped and not supported with citations to relevant legal authorities, the Court declines to consider it at this time. See *Phillips v. Allen*, 743 F. Supp. 2d 931, 947 (N.D. Ill. 2010) ("Failure to properly develop an argument with citation to relevant legal authority constitutes a waiver." (collecting cases)), aff'd, 668 F.3d 912 (7th Cir. 2012).

Defendant also argues that Plaintiff failed to establish that he suffered from an adverse action. However, for the reasons discussed above, the Court concludes that Plaintiff's FFD evaluation and subsequent mandated leave constitute an adverse employment action. Still, Defendant argues that Plaintiff has not identified sufficient evidence for a reasonable jury to find a nexus between Plaintiff's statutorily-protected expression and that adverse employment action. To establish the causation factor of his retaliation claim, Plaintiff must show "that 'the desire to retaliate was the but-for cause of the challenged employment action.'" *Gracia v. SigmaTron Int'l,*

*Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* (internal quotation marks and citation omitted). Defendant notes that Plaintiff's complaints were made against Banda and not Michael, the supervisor who requested the FFD evaluation. Defendant further notes that the purported adverse action occurred in February 2015, nine months after the May 23, 2014 meeting in which Plaintiff complained about Banda.

Given the nine-month gap between Plaintiff's statutorily protected activity and the FFD evaluation, the Court agrees that the timing of the FFD evaluation alone is insufficient to establish the requisite causal nexus. *Longstreet v. Illinois Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002) (holding that a 4-month gap alone insufficient to establish a causal connection). However, Plaintiff does not rely on the timing of the FFD evaluation to establish a nexus. Rather, Plaintiff contends that the fact that Michael cited absenteeism—even though Plaintiff did not have an absenteeism problem—and completed the FFD form with Banda proves that there is a nexus between Plaintiff's complaints and the FFD evaluation.

Even crediting Plaintiff's assertion that he did not have an absenteeism problem, Plaintiff still does not identify sufficient evidence for a reasonable jury to find a causal connection between his verbal complaint during his interview with Lockhart and the FFD evaluation. Michael testified that he did not care about the attendance issue and that he would have initiated an FFD evaluation irrespective of whether Plaintiff had an absenteeism problem. [46-6 (Michael Dep. Tr.), at 22-23.] Thus, even if the Court assumes that Banda fabricated attendance issues in retaliation for Plaintiff making a verbal complaint against him, that did not cause Michael to initiate the FFD evaluation. Nor has Plaintiff identified any evidence indicating that the evaluation of any attendance issues

prolonged the FFD evaluation process. Although not explicitly, Plaintiff also implies that Michael retaliated against Plaintiff for complaining about Banda assigning him to an erratic shift schedule that was having adverse effects on Plaintiff's health. [47, at 12 ("Then, when plaintiff complained about Mr. Banda to Mr. Michael on February 23, 2015, Mr. Michael makes up that plaintiff said he cannot safely perform his job on the phone and cites absenteeism.").] However, Plaintiff does not identify any evidence establishing indicating that his complaint to Michael was related to any protected status. Indeed, Plaintiff does not identify this complaint in the portion of his brief addressing whether he engaged in statutorily protected activity. To the extent that Plaintiff contends that Michael fabricated the story about Plaintiff saying that he could not perform his job safely in retaliation for Plaintiff's complaint against Banda nine months earlier, Plaintiff does not identify any evidence indicating that Michael even was aware of the relevant complaint against Banda—the individual against whom the complaint was made. Under these circumstances, no reasonable jury could conclude that the desire to retaliate was the but-for cause of the initiation of the FFD evaluation. *Hobbs v. Potter*, 2009 WL 2746824, at *7 (N.D. Ill. Aug. 27, 2009) ("Proof of retaliation under the indirect method presupposes that the decision-maker knew that plaintiff engaged in statutorily protected activity." (citing *Tomanovich*, 457 F.3d at 668-69)). Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's retaliation claim.

## IV.    Conclusion

For the reasons set forth above, Defendants' motion for summary judgment [42] is granted in part and denied in part. The case is set for further status on October 9, 2019 at 9:00 a.m.

26

Dated: September 30, 2019

_____
Robert M. Dow, Jr.
United States District Judge